## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANET ACKERMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; SIMON & SCHUSTER, INC.; AND PENGUIN RANDOM HOUSE LLC.<br><br>Defendants. | Civil Action No. 1:21-cv-3411<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Janet Ackerman, individually and on behalf of all others similarly situated, brings this action against Defendant Amazon.com, Inc. ("Amazon") and alleges as follows:

### I.      INTRODUCTION

1.      Amazon operates Amazon.com, the world's largest online retail platform and largest e-book seller in the United States. Amazon sells at least 76% of all e-books sold—a market that is expected to surpass six billion dollars in 2021. Amazon has used its dominant power in the e-book market to preclude price  competition. As a result, Plaintiff and class members have paid and continue to pay  supracompetitive prices for e-books.

2.      The U.S. book publishing industry is dominated by the "Big Five": Defendants Hachette Book Group, Inc. ("Hachette"); HarperCollins Publishers L.L.C. ("HarperCollins"); Macmillan Publishing Group, LLC ("Macmillan"); Simon & Schuster, Inc. ( "Simon & Schuster"); and Penguin Random House LLC ("Penguin"). The Big Five have conspired with Amazon with respect to the violations described herein during the entire conspiracy. The Big Five publish "trade

books," among others, which encompass general interest fiction and non-fiction books, as opposed to "non-trade" books such as academic textbooks, reference materials, and other texts. The Big Five's trade books account for about 80% of domestic trade book sales.

3.     The Big Five generally sell their e-books to consumers through online retail platforms such as Amazon, Barnes & Noble, and Apple Books. Their dealings with those platforms are based on the "agency model," under which the publisher sets the price and retailers—as agents for the publisher—take a commission on the sale to consumers like Plaintiff and class members.

4.     Amazon and the Big Five agreed to price restraints that caused Plaintiff and the Class to pay supracompetitive prices for e-books purchased from the Big Five through a retail platform other than Amazon.

5.     United States and European antitrust authorities have repeatedly investigated e-book prices in the last ten years, and the Connecticut Attorney General's office recently disclosed a new investigation into Amazon's e-book business.

6.     The European Commission ("EU Commission") first investigated potential collusion among the Big Five and Apple beginning in 2011. The Department of Justice ("DOJ") and attorneys general from several states filed a civil action against the same entities in this District in early 2012.[1] Both the District Court and the EU Commission determined that the Big Five had colluded with Apple to raise retail e-book prices.[2] At that time, the agreement entailed switching from a standard wholesale model (wherein the retailer sets retail prices) to an agency model (wherein the publisher sets retail prices and the retailer acts strictly as its agent). Pursuant to that

---

[1] House Judiciary Committee, Investigation of Competition in Digital Markets (Oct. 5, 2020), at 333, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("House Report"); 5.4.2017 EU Commission Decision at 8.
[2] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 (S.D.N.Y. 2013); 5.4.2017 EU Commission Decision at 8.

conspiracy, the Big Five agreed to most favored nations clauses ("MFNs") with Apple that required them to sell their e-books for the same prices via Apple's online store as they did via all other e-book retailers, including Amazon.

7.     The District Court entered two consent decrees against the Big Five.[3] The Big Five reached settlements with the EU Commission around the same time.[4] Both the consent decrees and the settlements required the Big Five to cease colluding with each other, to refrain from using MFNs in their agreements with e-book retailers for five years, and to permit e-book retailers to subtract their own discounts from the retail prices of the Big Five' e-books for two years.[5]

8.     The Big Five's e-book prices decreased substantially during that two-year period, but immediately thereafter, in 2015, they renegotiated their agency agreements with Amazon and increased their prices. They have continued to maintain supracompetitive prices.

9.     Although Amazon claimed publicly that it was negotiating with the Big Five to ensure that it could continue to discount their e-books following the term of the consent decree, that did not transpire. The week after disclosing their agency contracts with Amazon, Penguin increased its e-book prices by 30%, HarperCollins increased its prices by 29%, Simon & Schuster increased its prices by 16%, Hachette increased its prices by 8%, and Macmillan increased its prices by 11%.

10.    The Big Five also raised prices for new releases and reduced the number of price ranges into which they consolidated e-book prices. During the Apple conspiracy, the Big Five

---

[3] *See* Department of Justice, *U.S. v. Apple, Inc., et al.*, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.

[4] 5.4.2017 EU Commission Decision at 8 n.11.

[5] 5.4.2017 EU Commission Decision at 8; *see, e.g.*, Final Judgment as to Defendants The Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), *United States v. Apple*, Case No. 12-cv-02826-DLC (S.D.N.Y.), Docket No. 259 ("Final Judgment Penguin"), at 8 https://www.justice.gov/atr/case-document/final-judgment-defendants-penguin-group-division-pearson-plc-and-penguin-group-usa.

priced 80% of their e-books within four price ranges. The proliferation of additional price ranges increased substantially during the period of time covered by the DOJ consent decrees. After entering into their agreements with Amazon in 2015, by 2018, the Big Five gradually reverted to using three or four price buckets, which has continued through the present.

11.     The Big Five's e-book prices were most varied in 2014, during the consent decree term. After adjusting for inflation, e-book prices clustered around $12 and only about 5% of titles sold were in the $15 range. In 2020, 55% of titles sold for about $15 and less than 5% sold around $12.

12.     Had Amazon and the Big Five raised prices only on Amazon, consumers would be free to shop for competitively priced e-books on other online platforms; however, they agreed to price restraints that prevented that from happening.

13.     The EU Commission commenced another investigation in 2015,[6] and determined that Amazon used MFNs in its agreements with the Big Five, despite their ostensibly being precluded from agreeing to MFNs by their earlier settlements with the EU Commission.[7] The EU Commission found that the MFNs and analogous provisions in the Big Five's contracts with Amazon had probable anticompetitive effects.[8] Amazon and the EU Commission reached a settlement in 2017 that prohibited Amazon from enforcing its MFNs and similar provisions for five years.[9] But that settlement had no effect on Amazon's agreements with the Big Five in the United States.

14.     Starting in 2019, the House Judiciary Committee investigated Amazon pursuant to

---

[6] European Commission Initiates Formal Proceedings Against Amazon,
https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_1359_6.pdf.
[7] 5.4.2017 EU Commission Decision at 4-5.
[8] *Id.* at 20-38, 43.
[9] *Id*. at 39, 41-42.

a broader investigation of competition in digital markets.[10] After a 16-month investigation, the Committee issued a report and recommendations. The Committee determined, among other things, that Amazon's use of MFN provisions in its agreements with publishers harms competition in the retail book market, including the e-book market.[11] The House Report concluded that "Amazon's dominance in e-books and its anticompetitive application of price parity clauses to its business relationships in this market eliminates the ability of rivals or new entrants to gain any meaningful competitive advantage relative to Amazon."[12]

15.    The pending Connecticut investigation is similarly focused on Amazon's agreements with publishers, and each Big Five publisher received a subpoena in 2019 pursuant to that investigation.

16.    Consumers do not sufficiently benefit from the cost reductions resulting from the low printing and distribution expenses associated with e-books as compared to print books. Amazon charges high commissions and other costs to publishers, including the Big Five, which significantly increases retail prices for e-books sold by Amazon. Amazon increases the cost of selling e-books by tying its distribution services (e.g., helping consumers find and purchase e-books on the Amazon platform, processing payments, delivering e-books) to its advertising services, which are designed to optimize the placement of advertisements to consumers on its online platform. Amazon further raises the Big Five's selling costs by manipulating e-book discovery tools to make a publisher's books difficult to find without the purchase of advertising or refusing distribution unless the publisher also purchases advertising.

17.    Moreover, via its MFNs, Amazon has required, and publishers have agreed to grant

---

[10] House Report at  6.

[11] *Id.* at 295.

[12] *Id.* at 296.

Amazon, prices, terms, and conditions equal to or better than those offered to Amazon's competitors, and to notify Amazon about such terms, thereby restricting discounts to consumers and stifling innovation in the trade e-book market.

18.     In a competitive market, the Big Five could sell e-books at lower prices on their own websites or through Amazon's competitors that offer lower commissions and fees. But they have agreed with Amazon not to do that. This prevents Amazon's competitors from expanding their market shares and reduces the incentive for new competitors to enter the market.

19.     Amazon and the Big Five entered into these anticompetitive agreements with the purpose and effect of injuring consumers by eliminating price competition that Amazon would otherwise face and raising e-book prices sold through Amazon's retail rivals above competitive levels.

20.     Because Amazon and the Big Five have not made the exact terms of their agreements public, Plaintiff relies on public disclosures and investigations. These reports describe in a broader sense the contractual arrangements that Amazon uses in its agreements with publishers to prevent competition from other online e-book retailers.

21.     MFNs typically entitle a buyer to prices and/or terms equal to or better than those a seller offers to any other buyer. But Amazon's contracts with the Big Five are an adaptation of MFNs to the agency model. The Big Five rely on the agency model to sell e-books, which means that Amazon is not a buyer and the Big Five are not its suppliers.

22.     Though Amazon has avoided using the term "most favored nation," the Judiciary Committee found that Amazon has continuously imposed on book publishers contract provisions that effectively function as MFNs, even under the current agency model.[13] Amazon uses these

---

[13] House Report at 295.

provisions to prevent publishers from partnering with any of Amazon's competitors and to reinforce Amazon's stranglehold and control over book distribution. Because of Amazon's market power in the retail e-book market, these contractual requirements prevent Amazon's actual and potential retail competitors from introducing alternative business models, offering promotional advantages, or offering customers lower prices on their own. The House Judiciary Committee's findings are consistent with the EU Commission's earlier conclusions.[14]

23.     The EU Commission divided Amazon's MFN practices into five categories.

24.     First, the EU Commission determined that Amazon uses business model parity clauses in its contracts with e-book publishers. These clauses require the Big Five to notify Amazon of the distribution of their e-books through alternative business models, and offer Amazon the same material terms and conditions, even if the competing retailer itself operates under a different business model. Alternative business models include subscriptions, streaming, rentals, book clubs, bundling of e-books with print books, and reduced prices for partial downloads. This clause creates a debilitating disincentive for the Big Five to support and invest in innovative business models that might result in greater competition. It likewise disincentivizes Amazon's e-book retail competitors from developing such models. It also deters the entry of new e-book retail competitors or the expansion of Amazon's existing competitors, which reduces competition in the e-book retail market and strengthens Amazon's dominant position in that market.[15]

25.     Second, Amazon imposed, and the Big Five agreed to, "selection parity clauses." These clauses require the Big Five to offer Amazon parity with all its competitors with respect to: (1) any e-book available within a particular geographical territory; (2) any date and time for an e-

---

[14] *Id.* at 295-96; 5.4.2017 EU Commission Decision.
[15] 5.4.2017 EU Commission Decision at 9, 12, 22-26.

book's release; and (3) any feature, functionality, usage rule, element or content for one or more e-books.[16]

26.     The EU Commission found that such clauses in Amazon's contracts with the Big Five posed serious threats to competition in numerous ways. They reduced the incentives of Amazon's competitors to develop and innovate features and functionalities of e-books. They also thwarted development and innovation in e-books and e-book readers. Amazon's selection parity clauses harm consumers by eliminating publishers' incentive to develop new e-book functionalities. It harms retail competition because it forecloses a significant avenue for retailers to compete with Amazon by supporting such functionalities.[17]

27.     Third, Amazon required, and the Big Five maintained, "retail price parity" provisions in their agency contracts with Amazon. These retail price parity clauses included: (1) the agency price parity clause; (2) the discount pool provision; and (3) the promotion parity clause.[18]

28.     The agency price parity clause contractually obligated the Big Five to set retail prices on Amazon that are no higher than the retail prices charged by Amazon's competitors.

29.     The promotion parity clause precludes the possibility that the Big Five might even temporarily set lower retail prices on the platform of any Amazon e-book competitor, absent offering an equivalent promotion to Amazon.

30.     Similarly, the discount pool provision gives Amazon the ability to set discounted prices which are equal to or less than the cheapest retail price of any e-book distributed by a publisher to Amazon's competitors.

31.     The EU Commission determined that Amazon's retail price parity provisions in the

---

[16] *Id.* at 27-31.
[17] *Id.*
[18] *Id.* at 32.

contracts with the Big Five limited the ability of Amazon's competitors "to attract buyers by offering lower retail prices than those on Amazon. This may discourage competing E-book Retailers from entering in the first place."[19] The Commission determined that these arrangements were likely to reduce competition between e-book retailers by reducing the incentive of Amazon competitors to compete by offering lower rates of agency commissions. Further, such arrangements actually incentivize Amazon to charge higher commission rates, as e-book suppliers had no ability to steer customers away from Amazon to its competitors based on their commission or retail price.[20]

32.     These retail price parity provisions functioned like MFNs in that they enabled Amazon to prevent its competitors from undercutting the Big Five's e-book prices on Amazon. Once notified of the availability of the Big Five's e-books at lower prices, Amazon typically "requested" that they charge the same prices on Amazon.[21] In the rare case a publisher did not comply, Amazon retaliated or threatened to retaliate by disabling purchases for one or several of the publisher's e-books on its platform, excluding the publisher's e-books from all promotional activity, removing the pre-order buttons for the publisher's e-books, or by prominently displaying banners for other publishers' e-books.[22] Eventually, the Big Five complied with all of Amazon's requests and ceased entering into promotions proposed by Amazon's retail competitors.[23] These notification provisions are anticompetitive because they eliminated any incentive for the Big Five to offer lower prices or better terms to any of Amazon's existing or potential competitors.

33.     After the European Commission's investigation concluded, Amazon agreed not to enforce its MFNs and similar provisions in Europe for the next five years. That entailed no longer

---

[19] *Id.* at 33.
[20] *Id.* at 34.
[21] *Id.* at 36.
[22] *Id.* at n.55.
[23] *Id.* at 37.

requiring publishers to provide Amazon with equal or better terms than they provided to its competitors; and no longer requiring publishers to notify Amazon about its competitors' alternative or new business models, release dates, selections of e-books, features of their e-books, promotions, agency prices, agency commissions or wholesale prices. One Commissioner remarked that the agreement would "open the way for publishers and [booksellers] to develop innovative services for e-books, increasing choice and competition to the benefit of European consumers."[24]

34.     Amazon's and the Big Five's continued use of MFNs in the United States remains anticompetitive and contrary to the European Commission's well-founded conclusions. Despite multiple investigations and censures, Amazon and the Big Five continue to engage in a conspiracy to fix the retail prices of e-books in violation of Section 1 of the Sherman Act.

35.     Amazon's agreements with the Big Five constitute an unreasonable restraint of trade that prevents competitive pricing, limits innovation, and imposes overcharges on Plaintiff and other consumers when they purchase the Big Five's e-books from Amazon's competitors. Plaintiff therefore seeks, in addition to compensatory damages, injunctive relief under the Clayton Act to prevent Amazon and the Big Five from enforcing these restraints.

36.     Amazon maintains monopoly power in the domestic retail trade e-book market. Amazon has willfully acquired that monopoly power through anticompetitive conduct, fixing the retail prices of trade e-books at supracompetitive levels on both its own platform and those of its competitors. Its conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

## II.     JURISDICTION AND VENUE

---

[24] *Id.*

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and class members are citizens of different states than Defendants.

38.     Venue is proper in this District pursuant to Sections 4, 12, & 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). Amazon resided, transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

### III.     PARTIES

#### A.     Plaintiff

39.     Janet Ackerman is a resident of Brooklyn, New York. Ms. Ackerman purchased multiple e-books published by one or more defendants via Apple Inc.'s app store during the proposed class period.

#### B.     Defendants

40.     Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon is active in online retail, e-commerce services, digital content, and web and infrastructure computing services. Amazon sells e-books and offers e-book reading subscription services to its retail customers throughout the United States from the Amazon platforms. Amazon also operates Amazon Publishing, a division that publishes books and competes with the Big Five.

41.     Hachette Book Group, Inc. is a Delaware corporation with its principal place of business in New York, New York. Its imprints include, among others: Center Street; FaithWords; Grand Central Publishing (formerly Warner Books); Little, Brown and Company; Orbit; Perseus

Books; and Worthy.

42.     HarperCollins Publishers L.L.C. is a Delaware corporation with its principal place of business in New York, New York. Its imprints include, among others: Avon; Caedmon; Ecco; Harlequin Books; Walden Pond Press; and William Morrow.

43.     Macmillan Publishing Group, LLC is a New York corporation with its principal place of business in New York, New York. Macmillan operates eight divisions in the United States: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge.

44.     Penguin Random House LLC is a Delaware corporation with its principal place of business in New York, New York. Its imprints include: Alfred A. Knopf; DK; Doubleday; Penguin; Putnam; Random House; Viking Books; and Vintage Books.

45.     Simon & Schuster, Inc. is a New York corporation with its principal place of business in New York, New York. Its imprints include: Beyond Words Publishing; Folger Editions; Gallery Books; MTV Books; Pocket Books; and Scribner.

### IV.     STATEMENT OF FACTS

**A.     The Big Five Dominate the Market for the Publication of Trade Books.**

46.     The Big Five generally publish the most popular authors and books in both fiction and non-fiction, including most New York Times bestsellers. Their dominance is in large part attributable to a long history of mergers and acquisitions that has resulted in their acquiring vast numbers of subsidiaries and divisions, more commonly known in the industry as "imprints." The last decade in particular has seen a wave of major acquisitions.

47.     HarperCollins was established in 1817 as J. and J. Harper, and eventually became Harper & Row. Hachette's American division began as Little, Brown and Company, established in

1837. In the 1920s, Penguin, a leading British publisher, acquired several formerly independent publishers, including Viking and Putnam. Simon & Schuster was established in 1924, and it has been previously owned by Marshall Field, Gulf + Western, Viacom, and CBS Corporation. By 1950, publishing was substantially "concentrated in a relatively few houses."[25]

48.     Consolidation accelerated in the 1980s. By 2006, the six largest U.S. trade book publishers accounted for 90 percent of total sales. In 2013, Penguin merged with Random House, and now controls approximately 25% of the English-language publishing market.[26]

49.     Smaller trade publishers are increasingly unable to compete with the Big Five. Houghton Mifflin Harcourt recently announced that it was exploring a sale of its trade publishing division, possibly to Macmillan or Hachette.

**B.     Amazon Dominates the Market for the Retail Sale of Trade Books.**

50.     Amazon sells more books than any other retail outlet in history. Prior to Amazon's emergence, there were approximately 4,000 independent bookstores in the United States. That number has since halved, and Amazon now controls 76% of the e-book market.

51.     Unlike brick-and-mortar stores, Amazon relies on massive data to assess its customers' existing interests. According to the market research firm Codex Group, readers browsing in a physical bookstore consider new books at about three times the rate they do while shopping on Amazon. Even though it dominates the book market, Amazon accounts for only seven percent of new book discovery. The corresponding figure for independent bookstores is 20%.[27]

**C.     The Development of E-books Disrupted the Trade Book Industry.**

---

[25] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1260 (2019).
[26] *Id*. at 1260, 1262.
[27] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS (Nov 29. 2016), https://ilsr.org/amazons-monopoly/ at 27.

52.     In 2007, Amazon's Kindle became the first e-reader to gain widespread commercial acceptance, and Amazon became the market leader in the sale of e-books and e-book readers, selling nearly 90% by 2009. Amazon gained market share by discounting new releases and bestsellers, and other e-book retailers frequently matched its prices.

53.     At that point, the Big Five distributed both print books and e-books through a standard wholesale pricing model, under which they only suggested retail prices. They typically discounted their wholesale prices for e-books by 20% from those for equivalent print books, due to the reduced costs associated with e-books. With those discounts, Amazon's standard $9.99 retail price roughly matched the wholesale price of many of its e-books.

54.     The Big Five feared that Amazon's $9.99 price point would undermine their profits, by both reducing unit sales of profitable hard-cover books, and conditioning customers to expect lower prices for hard-cover books. They also feared Amazon's unprecedented power in the industry and the possibility that Amazon might bypass them entirely by dealing directly with authors and literary agents.

55.     In 2009, each Big Five publisher separately objected to Amazon about its retail pricing, all to no avail. Undeterred, they collectively turned to Apple to address the issue. Apple complied because it recognized that selling e-books was potentially even more lucrative than selling digital music. Apple believed that its iPad, which was in its final planning stages, would revolutionize the e-reader market by virtue of technological features vastly superior to those of any existing e-reader.

56.     Over the course of a few weeks during late 2009 and early 2010, Apple and the Big Five agreed that the Big Five would have to adopt the agency model in order to raise retail prices.

That model would enable the publishers to set retail prices and sell the books, while Apple would receive a 30% commission for facilitating the sales. When certain Big Five publishers hesitated to go forward with the plan, Apple put a MFN clause in the proposed written agreements that would ensure that the Big Five priced their e-books on Apple at or below the lowest retail price otherwise available in the marketplace. Apple thus enabled the Big Five to set their e-books' retail prices, while at the same time guaranteeing that it would never have to compete on price.

57.     The Big Five then forced Amazon to accept the agency model by threatening to withhold their e-books by seven months after releasing the corresponding print books. After unsuccessfully attempting to retaliate, Amazon complied, but filed a complaint with the FTC. Amazon entered into agency agreements with each Big Five publisher by mid-2010. Each agreement included a "model parity" clause that gave Amazon the option to re-adopt the wholesale model if the publisher agreed to such a model with any other e-book retailer. The Big Five subsequently required Google and Barnes & Noble to enter into agency model agreements for e-books.

58.     E-book prices immediately increased across the market. Apple and the Big Five profited in the short term. Apple gained 22% of the retail e-books market in the first two months of operating its sales platform.[28] The Big Five lost revenue as to e-books under the new model, but offset those losses by raising the prices of their print books.[29]

59.     However, in late 2011, consumers filed a price-fixing class action in this District, and the EU Commission opened its own investigation. In 2012, the DOJ and several attorneys general filed enforcement actions. Rather than proceeding to trial in the federal actions, the Big Five

---

[28] Marco Tabini, *Apple grabs 22 percent of e-book market with iBooks* Macworld (Jun. 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.
[29] *Apple Inc*., 952 F. Supp. 2d at 683.

entered into consent decrees with the DOJ, which required them to terminate their agreements with Apple and other e-book retailers that restricted the retailers' ability to discount e-books.[30] Apple proceeded to trial in this District. The court found that Apple and the Big Five had carried out a per se illegal horizontal price-fixing agreement, with the purpose and effect of eliminating price competition in the e-book market.[31] The court entered a $450 million judgment against Apple.

60.     The consent decrees required that, for a period of two years, the Big Five would permit retailers to discount e-book prices and to offer promotions to encourage consumers to purchase e-books. For a period of five years, they would not enter into agreements with e-book retailers that contained MFN clauses governing prices.[32] They agreed to similar provisions to resolve the European proceeding.

61.     As a result, competitive pricing prevailed between 2013 and 2015. But prices rose as soon as the publishers renewed their agency agreements with Amazon.

**D.     As a Trade Book Publisher, Amazon Benefits from Inflated E-book Prices.**

62.     In part due to the friction between itself and the Big Five, Amazon established Amazon Publishing, which touts itself as a leading publisher of commercial and literary fiction, nonfiction, and children's books.

63.     Amazon claims that at least 36 of its authors have sold at least a million books.[33] Amazon's imprint, Amazon Crossing, is the largest publisher of translated fiction in the United States.[34] Amazon currently operates 16 imprints and has nine offices around the world.

---

[30] *See*, e.g., Final Judgment Penguin, at 8-9.
[31] *Apple Inc.*, 952 F. Supp. 2d at 694.
[32] Final Judgment Penguin, at 11, 18.
[33] Amazon Publishing, https://amazonpublishing.amazon/about-us.html.
[34] Ed Nawotka, *Translations Pay off For Amazon*, (Nov. 8, 2019) Publisher's Weekly, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/81707-translations-pay-off-for-amazon.html.

64.     Amazon thus benefits from the Big Five's high prices, which enable Amazon to charge higher prices for its own e-books.

**E.     Amazon Uses Anticompetitive Restraints to Immunize Itself from the Disadvantages of the Big Five's Inflated E-book Prices.**

65.     Through its dominance of the e-books retail market, Amazon maintains substantial bargaining power with the Big Five. Amazon could have maintained its ability to discount their e-books, but instead agreed to let them set supracompetitive retail prices in exchange for high commissions and a guarantee that Amazon could not be undersold by its competitors.

66.     According to the House Judiciary Committee, Amazon has at all times used MFNs or their equivalents in its agreements with trade publishers.[35] The EU Commission determined that even when the Big Five were nominally prohibited from having MFNs in their contracts, they evaded that restriction in dealing with Amazon by using notification provisions that had the same effect.[36]

67.     No matter the means, Amazon's objective has always been to prevent publishers from partnering with any of Amazon's competitors and to reinforce its control over book distribution. Amazon has acquired and maintained its monopoly power in large part through these restraints.[37] Its competitors lack any incentive to offer promotional advantages or alternative business models to gain market share because Amazon requires that the Big Five grant it whatever opportunities they offer to Amazon's competitors. The result is reduced innovation and supracompetitive retail prices.[38]

**F.     Amazon is the Subject of Government Investigations for Possible Antitrust Violations.**

---

[35] House Report at 295-96.
[36] 5.4.2017 EU Commission Decision at 11.
[37] House Report at 295-96.
[38] 5.4.2017 EU Commission Decision at 20-38, 43.

68.     The EU Commission investigated Amazon's contracts with e-book publishers between 2015 and 2017. The Commission cited numerous issues relating to Amazon's MFNs and notification clauses, finding that Amazon used these clauses to restrain its competitors' market shares and discourage potential competitors from entering the market.

69.     The House Judiciary Committee began an investigation in 2019 that entailed seven hearings on digital markets, addressing issues that included data privacy, innovation, free speech, and competition. Pursuant to that investigation, the Committee requested documents and information regarding Amazon's market share and competitors in numerous markets.[39]

70.     The Committee issued a report in October 2020. It concluded that Amazon serves as a gatekeeper over a key channel of distribution, the domestic online retail market, and by controlling access to that market, Amazon is able to abuse its tremendous power by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on it.[40] It also uses its gatekeeper position to maintain its market power and "to further entrench and expand" its dominance. The Committee compared Amazon's conduct to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[41]

71.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, and New York, in addition to

---

[39] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos,  Amazon CEO (Sept. 13, 2019),
https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.
[40] House Report at 6, 15.
[41] *Id.* at 6.

the recently disclosed Connecticut investigation addressed strictly to e-books. [42]

## V. EFFECTS ON INTERSTATE TRADE AND COMMERCE

72. Defendants' alleged business activities are within the flow of, and substantially affect, interstate trade and commerce.

73. During the Class Period, Amazon's and the Big Five co-conspirators published, sold, or facilitated the sale of trade eBooks across state lines. Their conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## VI. RELEVANT MARKET

74. The antitrust injuries alleged herein, including harm to consumers, have occurred in the United States retail market for trade e-books. Amazon and the Big Five co-conspirators' agreed-upon price restraints unreasonably restrain these markets. Plaintiff seeks relief individually and on behalf of other retail purchasers of trade e-books from one or more of the Big Five co-conspirators through electronic platforms other than Amazon's platform.

75. Amazon's restraints on competition directly impact the U.S. retail market for trade e-books, as alleged herein.

76. Trade books comprise a product market distinct from non-trade books, such as reference and academic books. They also comprise a product market distinct from self-published books. Self-published authors incur all costs and are solely responsible for content and marketing, whereas trade publishers receive the rights to sell authors' books in exchange for editing, publishing, marketing, and distributing those books. Trade publishers are highly selective. They do

---

[42] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news- events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[43] The selection, editing, and promotional process is expensive, and trade books reflect publishers' investment in that process.

77.    Within the market for trade books, there is also a distinct product market for the retail sale of trade e-books that is separate from the retail sale of trade print books and trade audio books.

78.    Products' functional interchangeability typically depends on their physical characteristics. E-books are digital products. Their physical characteristics differ from those of print books. They are also different from audio books, which may be physical or digital, but are made for listening rather than reading. These distinctive characteristics place print books and audiobooks outside of the markets for e-books.

79.    The EU Commission determined that consumers would be unlikely to switch from e-books to print books in the event of a 5-10% increase in the retail price of e-books, because e-books would still generally be priced significantly lower than print books.[44] Consumer preferences also play an important role in distinguishing the two formats. The EU Commission's investigation of the e-books market showed that consumers will purchase e-books rather than print books for reasons including the following: (i) e-books are easier to carry, particularly when travelling; (ii) e-books have functionalities unavailable in print books, such as the ability to vary the type and size of fonts; (iii) e-books have interactive features such as video or music add-ons, dictionaries, and links to additional information regarding the text or the author; and (iv) e-books can be purchased, downloaded and read immediately at any time. The EU Commission also noted that a significant

---

[43] Fiction Writer's Mentor: Odds Of Being Published, http://www.fiction-writers-mentor.com/odds-of-being-published (last accessed Feb. 15, 2021).
[44] 5.4.2017 EU Commission Decision at 14.

number of titles are only, or more readily, available in the e-book format.[45]

80.     To find significant supply-side substitutability, print book retailers and e-book retailers would have to be able to enter each other's markets quickly and easily. The EU Commission found that was not possible. The distribution of print books entails substantial investments in warehousing and logistics, whereas e-book distribution requires establishment and maintenance of an online distribution platform. A standard print bookstore cannot switch from selling print books to e-books without acquiring significant tangible and intangible assets, incurring additional investments and making significant strategic decisions. The same holds true for an e-book retailer switching to print sales.

81.     The EU Commission found that audio books are distinct from both print books and e-books, notably in terms of (i) pricing at the wholesale and retail levels and (ii) their typical end consumer and mode of consumption.[46]

82.     The relevant geographic market is the United States.

## VII.   ANTITRUST IMPACT AND INJURY

83.     Amazon's and the Big Five co-conspirators' conduct described herein has substantially impaired competition in the retail e-book market.

84.     Amazon's and the Big Five co-conspirators' conduct described herein lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury suffered by Plaintiff and class members more than offsets any purported procompetitive justifications Amazon may offer.

85.     Amazon increases the prices of e-books offered by its competitors, restrains

---

[45] *Id.*
[46] *Id.*

consumer choice, and otherwise causes antitrust injury to retail book purchasers in the form of overcharges. Plaintiff and class members have sustained, and continue to sustain, significant losses from overcharges directly attributable to Amazon's anticompetitive activity. Plaintiff will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is enjoined, Plaintiff and class members will continue to incur overcharges in their direct purchases of the Big Five's e-books from Amazon's competitors.

86.     Plaintiff and class members are direct purchasers who purchased the Big Five's e-books from Amazon's competitors, at prices inflated by Amazon and the Big Five co-conspirators' agreements detailed herein.

87.     Because of the agency model, Plaintiff and class members overpay whether they buy the Big Five's e-books directly from the Big Five on their own websites, or through retail e-book platforms that compete with Amazon. As required by the MFNs and similar clauses described herein, the Big Five sell at retail prices that are equal to or higher than the prices for which they sell their e-books on Amazon.

88.     It is in the Big Five co-conspirators' independent economic self-interests to expand their market shares of retail sales and diversify their distribution. It would serve their independent interests to allow Amazon's competitors to develop alternative business models that benefit both consumers and the Big Five. Offering Amazon's competitors special edition or enhanced e-books would attract new customers, increase sales, reduce the Big Five's dependency on Amazon, and limit Amazon's market power. But Amazon and the Big Five did not and do not consider those options, so as to preserve the supracompetitive prices of the Big Five's e-books. Plaintiff and class members who purchase directly from the Big Five through Amazon's competitors are harmed because they pay prices fixed by Amazon and the Big Five, without the benefit of discounts,

promotions, and potentially lower-cost alternative business models that would exist in a competitive

market.

89.     Because Amazon continues to enforce its anticompetitive MFNs and similar

restrictive provisions, Plaintiff and class members will continue to incur overcharges for the Big

Five's e-books. Both the actual harm and the threat of future harm are cognizable antitrust injuries

directly attributable to Amazon's violations of antitrust laws as alleged herein.

## VIII.   CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action on behalf of herself and, under Rules 23(a) and (b) of the

Federal Rules of Civil Procedure, on behalf of:

> All persons in the United States who, on or after January 18, 2017, purchased one
> or more e-books sold by the Big Five Publishers through a U.S. online retail
> platform other than Amazon.

91.     Excluded from the Class are Amazon; its officers, directors, management,

employees, subsidiaries, affiliates, and coconspirators. Also excluded are the judge presiding over

this action; his/her law clerks and spouse; any persons within three degrees of relationship to those

living in his/her household; and the spouses of all such persons.

92.     Class members are so numerous and geographically dispersed that joinder is

impracticable.

93.     Plaintiff's claims are typical of the claims of class members. Plaintiff and class

members were damaged by the same wrongful conduct of Defendants.

94.     Plaintiff will fairly and adequately protect and represent the interests of class

members. Plaintiff's interests are coincident with, and not antagonistic to, those of class members.

95.     Plaintiff is represented by counsel with experience in the prosecution and leadership

of class action antitrust and other complex litigation, including class actions involving the claims at

issue here.

96.     Questions of law and fact common to class members predominate over questions that may affect only individual class members, thereby making damages with respect to class members as a whole appropriate. Questions of law and fact common to class members include, but are not limited to:

> a.     Whether Defendants unlawfully conspired to unreasonably restrain trade in violation of federal antitrust laws;
>
> b.     Whether Defendants have unlawfully monopolized the domestic retail e-book market, including by way of the conduct described herein;
>
> c.     Whether competition in the domestic retail e-book market has been restrained and harmed by Amazon's monopolization of the market;
>
> d.     The amount of damages suffered by Plaintiff and class members; and
>
> e.     the nature and scope of injunctive relief necessary to restore a competitive market.

97.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

98.     The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

99.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

100.    By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Sherman Act ' 1)

101.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

102.    Plaintiff brings this claim on her own behalf and on behalf of the proposed Class described above. Plaintiff seeks damages and injunctive relief.

103.    Amazon, by and through its officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition in the price or availability of trade e-books, by agreeing to various anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs, thereby fixing and raising the prices of trade e-books.

104.    Defendants' combinations and conspiracy injured Plaintiff and class members by raising the prices of trade e-books and depriving them of free and fair competition in the retail market for trade e-books.

### SECOND CLAIM FOR RELIEF
### (Violation of the Sherman Act § 2)

105.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though

fully set forth herein.

106. Plaintiff brings this claim on her own behalf and on behalf of the proposed Class described above. Plaintiff seeks damages and injunctive relief.

107. The relevant product market is the retail market for trade e-books.

108. The relevant geographic market for the retail sale of trade e-books is the United States.

109. Amazon has had and continues to have at least 76% market share in the retail market for trade e-books.

110. Amazon has had and continues to have monopoly power in the retail market for trade e-books.

111. Amazon has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

112. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Amazon has substantially foreclosed competition in the retail market for trade e-books in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

113. Defendants' combination or conspiracy allowed Amazon to maintain its monopoly power in the retail market for trade e-books. Defendants created and maintained this conspiracy through a series of agreements. In these agreements, Amazon and the Big Five co-conspirators agreed, among other things, that Amazon would act as the Big Five co-conspirator's agent in the retail sale of trade e-books to Plaintiff and class members.

114. These agreements foreclosed competition in a substantial portion of the retail market for trade e-books and unlawfully maintained Amazon's monopoly, resulting in the payment of

supracompetitive prices for trade e-books by Plaintiff and class members.

115.    Amazon's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

116.    Amazon's monopolization conspiracy has injured and will continue to injure competition in this market.

117.    Amazon has acted with the specific intent of monopolizing the retail market for trade e-books in the United States.

118.    Amazon's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

119.    The conspiracy raised the retail prices for trade e-books above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

120.    Plaintiff and class members have been injured in their business or property by reason of Amazon's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

121.    Plaintiff and class members are threatened with future injury to their business and property by reason of Amazon's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

122.    Plaintiff and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf the proposed Class, respectfully requests the following:

a.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b) of the

Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class Counsel;

b.      That the conduct alleged herein be declared, adjudged, and/or decreed to be unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

c.      That Plaintiff and the Class recover their overcharge damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and

d.      That the Court award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:   April 19, 2021                     Respectfully submitted,

*/s/ Kevin Landau*
Kevin Landau
Brett Cebulash
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
bcebulash@tcllaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

lwang@gustafsongluek.com

Dianne M. Nast
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Simon Bahne Paris, Esquire
Patrick Howard, Esquire
**SALTZ, MONGELUZZI & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com